Next, we have Case No. 25-724, Kevin Duden v. State of Washington. Kevin Duden v. State of Washington May it please the Court, my name is Harold Franklin. I represent Mr. Duden in this action. This is an action stemming from the COVID-19 pandemic and the request for religious exemptions and reasonable accommodations. In this case, before I go into a large colloquy, Your Honor, I want to reserve a couple of minutes for rebuttal. But also, I want to just ask the Court, are there questions? Because the facts in this case are pretty straightforward. The issues are pretty straightforward. I just want to see if I need to clarify any facts that remain. Thank you for the invitation. I'll honor it. Your client requested a religious exemption from the mandatory vaccination requirements, correct? That is correct. Was that denied? Yes. Oh, excuse me. I'm sorry. The religious exemption section was not denied. The reasonable accommodation part was denied. Okay, so his religious accommodation was understood, granted, approved? Yeah, I guess the language… What he wanted to do, correct me if I'm wrong, is he wanted to do what he had been doing in the past with masking and social distancing, if you will. Is that right? As well as testing, and that's correct. He had already been doing this 10 months prior to the mandate being implemented. Is it correct that in this particular unit, that despite the use of masks and social distancing and testing, that 19 inmates contracted COVID-19? That I don't know. That true or untrue? I don't know that to be the case, Your Honor. Let me ask you this. Is it also true that four staff members died of COVID? Not at that facility, Your Honor. In the correctional department? Yes. At other facilities, there were four deaths. Where they were using masks, distancing, and testing? That information was not given to us, but we do know that there were four people. One died after the implementation of the mandate. So what they were wearing or what kinds of measures they were taking, that was not given. Okay, thank you. I don't know that. Thank you, Your Honor. But as the court has already pointed out, he was granted a religious exemption. I don't think that's in dispute. But if there is in dispute, the main issue on religious beliefs are sincerity. And when somebody risks their livelihood to support their religious beliefs, I think we've gone to the step where sincerity is proven. He risked the fact that he was against the COVID-19 vaccine, and he bet his job on that, and he lost that bet. But the question really is not then the religious exemption. He's entitled to it. But under the exemption, the state nonetheless gets to insist on certain things, if it would be, if I can say it in a sort of a lay summary way, if it would be an undue burden upon the state to accommodate. That's correct. So the question really is, what's the burden? Yes, and that is the question, and that's the questions that have not been answered. Well, they answered, but not in the way you like. Well, let's back up. First of all, as the court knows, Groff changed the landscape of these cases. And Groff required some kind of an analysis that dealt with operating costs, that dealt with the size and nature of the business, dealt with the practical operation and the impact of an accommodation. In other words, how would it disrupt workflow and then the impact on the employees? The general language out of Groff is the burden substantial in the overall context of the employer's business. That's correct. And none of those things were considered at all, the four items I just mentioned to you. There was no consideration. There was no cost analysis. They didn't even analyze the 10 months that he did mask, test, and distance. So there was no analysis at all. And that in and of itself brings a question of fact as to whether or not that analysis should have been done. It's undisputed that they did not do any cost analysis whatsoever regarding this reasonable combination request. Was he offered other employment? There was talk in the letter where he was dismissed. There was talk about reassignment. He investigated reassignment. He contacted the unit that did reassignment. And he found that no positions, and I repeat, no positions were open to him unless he was vaccinated. So ultimately, that reassignment was not made in good faith because they knew that he could not get those positions. And then the other issue was his seniority. He had less seniority than others that would have been also up for reassignment. So that was offered to him, but that was summarily found out to be inappropriate or not really in existence. The other thing that he offered was to allow himself to work remotely. In the letter, that was summarily just dismissed. They didn't consider it, even though there were quite a few of the people in the same category of his employment that were doing things virtually or remotely. When you say same category, do you mean the same job or the same job category? Job classification, not the same job. His job was, I guess, teaching and facilitating what they called DOCART, aggression replacement training. That's correct. That's one of his jobs. And if you take away the COVID, what that entailed in the pre-COVID period was a lot of in-person stuff, including touching. I mean, he's trying to teach these prisoners or help them not be aggressive. Right. So it's an in-person, pretty up close and personal sort of a job. That's true. But as we know, COVID changed all those. That's correct. So the question then is, can he do that job without or say it this way, what's the what's the burden on the state if he's not vaccinated? And the court says, you know, that's a pretty heavy burden and therefore you get the result you don't like. Yeah. Well, I don't I don't know what the burden is because they didn't calculate one. And that's not one of the problems. They didn't calculate the fact whether or not he could do remote work. And there's no calculation. There's no analysis to tell us that those classes could not be virtual. Counsel, the state did say, though, that the job for him, the essential component was that he be in person. So they used the word essential. Yeah. Well, again, essential aspects of all jobs were changed, changed dramatically in the COVID era. So to say it may have been true prior to COVID that he needed to be in person. But remember, Mr. Duden was a supervisor. He could assign the vaccinated his vaccinated under the people under him. I'm trying to figure out what the best word is without being offensive to those in-person classes. That's that's his prerogative as a supervisor. But again, there was no analysis to let us know where there he could or couldn't do. But we provided two examples that said that these those classes were done virtually during the COVID era. They had switched just like the court switched. We didn't do a lot of in-person court, even trials for that matter. Everybody made adjustments during the COVID era. And he was just asking for them to make an adjustment for his case. My time is up based on the two minute request for rebuttal. So thank you. Thank you, counsel. Good morning. May please the court. Special Assistant Attorney General for Appalese. A clear judicial consensus now recognizes that at the height of the COVID pandemic in 2021, the health and safety risk of allowing an unvaccinated employee to continue doing a job requiring significant in-person contact with others represents an undue hardship as a matter of law under Title seven. I take that. But we just heard that there might have been a possibility that the part of his job that had this in-person teaching could have been assigned to subordinates. What's your response? It's undisputed that that in-person teaching, which was always done in person, including throughout the pandemic. No, no. I'm asking a different question. Why couldn't he have signed that portion of his work to subordinates? It was an essential function and removing the essential function of a job is not a reasonable accommodation. That in turn would impose an essential functions tests from the ADA and not the Title seven religious accommodation provision, which also has an undue hardship analysis, which is similar to this court's. Right. But you have to show it's the state's burden to show the undue hardship. Right. You can't just say the job has an essential component of requiring in-person teaching. And that doesn't satisfy the undue hardship burden. Or does are you saying that that automatically satisfies it once the state asserts that this job in particular has essential features that that require in-person? I think it's a case by case analysis for sure. But in this case where it's undisputed that 30 percent of his job was direct in-person instruction, which was always in person. The undisputed evidence from his supervisor, Sarah Windersheimer, is that the administrative tasks that he says he could have done isolated were connected to the in-person work such that many of the, for example, recording post-class notes, evaluating which sure could be done on a computer afterwards. But it makes no sense for a different person to be doing the administrative class review from the person who actually delivered. I want to return the judge Fletcher's question, though. What evidence is there in the record to show that the state considered the possibility of having a supervisee of of of Mr. Duden take that role in doing the in-person training and not Mr. Duden himself? And what evidence is there that they considered it? And what evidence is there that there would have been undue hardship if the roles were switched? Well, the evidence comes in the denial letter and Ms. Benton's deposition testimony. And what those show is that not once, but twice, the Department of Corrections considered Mr. Duden's job tasks, determined that the in-person instructional component of it to inmates in a maximum security prison was essential to it. And could not be sent to others. And and then when he appealed, he essentially said, wait, please reconsider. They did it again and came to the same conclusion that, no, this, you know, nine out nine to twelve hours a week of delivering in-person instruction was a critical component of your job that couldn't be done remotely. And in Williams, we have done. Could it have been done by somebody else? That's even spotting your point that it's essential that someone be there in person to teach. Could someone other than Duden have done that? Not without imposing an undue hardship on the agency? It would not be a reasonable accommodation to take his core job duties of facilitating anger management classes for inmates for the purposes of reentry into the general population and have some other person do that while he just stays in an office or works from home. I mean, if you look at his position description, the position description contains a detailed evaluation of all the skills required for his position means he has to deal with crises and emergencies and be able to diffuse them, to be able to control inmates without using coercive means to be around armed guards. And the position description specifically says that this position is not eligible for telework. And it's at ER 60 to 64. Again, in the ADA context. Is your argument that it would have been too costly to have someone else replace Mr. Duden's role? I'm trying to understand, again, the nature of the undue hardship here. So not exactly. Or is it because Mr. Duden's skills are so unique that it must only be Mr. Duden and no one else in the facility could substitute for him? It's not exactly the individual cost for Mr. Duden, but Peterson and Williams recognizes that it's an aggregate cost inquiry for all similarly situated employees. And here you had 600 DOC employees requesting an accommodation. And certainly if there were to be a policy that, well, any in-person responsibilities that these employees have, we're just going to shift those other people and let you do the remaining job tasks that would have imposed in the aggregate a significant cost on DOC and certainly required the hiring of additional people. I mean, the undisputed evidence is that DOC would have had to have a different person in the classroom, even if Mr. Duden. How do we assess the undue nature of the burden if we don't have any cost data, which you admit in your brief that you didn't provide any? Well, this argument wasn't really raised in the district court. So I imagine it had been raised in the district court where if he had said, oh, you could have had other people doing my job, then maybe we would have had to do a more aggregate economic analysis. But Williams, a really important point from the Williams v. Legacy Health case, is that when you have a job that so obviously requires in-person contact, in that case it was nurses, physicians, assistant, respiratory therapists, the employer need not engage in a roving search for other possible accommodations. Where it's obvious that that person couldn't do their job, the core duties of their job, that's enough of analysis. Hall, in the Fourth Circuit, Hall v. Shepard Pratt, involved a similar situation where it was a hospital and the employee was a kind of admissions consultant where she would greet the patients coming in who were being treated for eating disorders. And she said, well, I could have done all my other job tasks remotely. I just couldn't greet these folks in person. And the Fourth Circuit said, no, you were a greeter. The core parts of your job were to greet. Now, did she have other administrative tasks? Sure. But the key focus is on what are the essential functions of your position? Are those pre-Groff cases? No, that's a COVID case. It's one of the 12 federal court of appeals decisions. Again, uniformly, the federal courts of appeal have held that when an employee's job involves significant in-person contacts, as Mr. Duden's did, that represents an undue hardship as a matter of law. And that has occurred in a wide range of job contexts, not just the medical context. But you see it for a TV journalist in the First Circuit case. You see it in bus drivers, lifeguards, certainly many cases in the prison context as well. Do we have a number or an approximation of a number as to what percentage of his job was the in-person, I'll call it teaching, plus the administrative aspects of writing up the notes and so on? So how much of his job was that plus the administrative aspects of that particular part of the job? So the job description assigns 30% to the in-person teaching and 40% to administrative tasks related to the teaching. So you're saying we got 70% of his job is either the actual in-person teaching or the summarizing and the administrative functions attached to his own in-person teaching? I think that is the best reading of the position description, Sarah Windersheimer's testimony and Mr. Duden's testimony. But I'd also add that it isn't simply a kind of adding up the timing responsibilities. It's about looking at what are the core duties of the employee, and if you take away those core duties, are they still doing their job in essence? I spent far more time preparing for this argument, for example, than actually delivering it. I hope. But if you – and I did most of that preparation by myself in isolation on a computer. But if you said, well, you could simply do all the preparation, but you just can't do the actual argument, I wouldn't be a very effective advocate. Can I ask you – I asked your friend on the other side about the experience of the department writ large or the Monroe Correctional Facility where Mr. Duden worked. What the experience was with masking and testing. Did people pass away? Did inmates get sick? What's your understanding of the record? Yes. So just to clarify, there was some confusion in the pleading. Mr. Duden worked at the Walla Walla State Penitentiary, not at Monroe, which is the maximum security prison in Washington. He worked in the two highest security units there, the IMU South and the West Complex. So in the three months leading up to the proclamation, so June through August 2021, across all DOC employees there was a 750 percent increase in COVID cases. There had been in the previous 18 months of the pandemic, from March 20 to August 21, four deaths across DOC employees. And to answer your question about protocols, yes, masking protocols mandatory in place pursuant to statewide Department of Health orders. Social distancing protocols in place so that the classroom size, I believe, had to be reduced to 10 and 8. And mandatory biweekly testing was in place for employees as well. I see I'm going over time, but if I can just finish this answer. Of course. My colleague on the other side suggested that in-person instruction had somehow been paused or suspended for Mr. Duden's classes. That's not true. SCR 125, which is Ms. Benton's deposition, states that in-person classes for the DOCART anger management program continued throughout the COVID pandemic. And Sarah Windersheimers, his supervisor's declaration, stated that in-person training was mandatory across all Washington correctional facilities. There was no virtual component to any anger management training. For those reasons and those stated in the brief, we asked the court to affirm. Sorry to steal your thunder at the end there, but I have a question about whether the whether the prisoners at the facility were required to be vaccinated. There is no evidence in the record that prisoners I don't believe they were required to be vaccinated. I don't think there was a legal mechanism. There was no gubernatorial proclamation, for example, requiring inmates who were there, of course, involuntarily to be vaccinated. The record doesn't tell us that one way or the other. Is that correct? The record does not tell you that one way or the other. I think that's right. I mean, Duden asserts that in his declaration. And I think it's fair to assume based on my knowledge of I can represent that prisoners were not mandated to be vaccinated. But we've seen that same argument, Judge Tong, in other cases, for example, in like the airline context where the employees, a pilot or flight attendant says, well, passengers weren't allowed to weren't required to be vaccinated. You've seen it in the school context where employees were required to be vaccinated, but some students weren't. And every court that I'm aware of has held that the undue hardship inquiry focuses on the hardship imposed by the employee and similarly situated employees, not the population served by the employer or the clients of the employer. And that makes sense to focus it on what the undue hardship is. What are the costs associated with accommodating this particular employee? Thank you, counsel. Thank you. Thank you, Honor. And I think counsel has actually stated our point. He stated that the class has continued, but they were altered. They had the distance. They didn't have as many in the class. All these things were things that were made as a result of the pandemic. But let's go back to the main issue. The issue of not being able to grant a reasonable accommodation as a matter of law is a roundabout way to say we don't have to do any analysis, of course. We don't have to say it's an undue burden on the defendants. All we have to say is that this person is dangerous to society, dangerous to his employers, dangerous to his employees, dangerous to his customers. And therefore, we don't have to do an accommodation. That's not what the court that's not what the law says. You still have to make an analysis. But let's let's just step back into the facts of this case. They claim that they didn't have to do it because it was a matter of law, but they offered a reassignment. Then why do that if you don't have to? Why do that if it's a as a matter of law, unreasonable to accommodate Mr. Duden, there's no reason because that's not the standard they were using. They simply did not analyze why they couldn't do what Mr. Duden said that he asked them to do. And Mr. Duden didn't ask for anything new. He just stated they were masking. They were distancing. They were testing the EEOC, the CDC before the man. The mandates were implemented, said masking, testing and distancing were all reasonable accommodations for unvaccinated people. But OSHA went the step next and said, and not only that, the vaccinated need to distance, test and mask, which is what happened after the letdown of the effectiveness of the vaccine took place. As soon as they were breakthrough transmission, excuse me, great breakthrough diagnosis of COVID. Then they went back to masking, testing and distancing. Why is it an undue burden for him to do the same thing? One person to do that when he was doing it for 10 months. There was no additional cost for him to do to allow this. There was no cost analysis, as we already said. So it's really a smokescreen to say, well, yeah, but we didn't have to do it because he was dangerous to society and therefore he couldn't work in his job. And counsel, there was no expert testimony. No, provided either side in this case.  So for those, oh, good. But those for all those reasons, your honor, we ask that the court find that there are issues of material facts still in dispute and ask that this case be remanded for further. Further proceeding, excuse me. Thank you, counsel. The case is submitted.
judges: HAWKINS, FLETCHER, TUNG